FILED
US District Court

AUG – 1 2008

BY ___rp___ 199

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

STEPHEN OTTO REITZ,

               Petitioner,

       v.

CHARLES HARRISON, Warden

               Respondent.

)
)
)
)
)
)
)
)
)
)
)

Case No. CV 07-1119-ABC (JTL)

ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

      Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Habeas Corpus, all the records and files herein, and the Final Report and Recommendation of the United States Magistrate Judge. The Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

      IT IS ORDERED that judgment be entered dismissing the Petition for Writ of Habeas Corpus with prejudice.

DATED: ___8/1/08___

AUDREY B. COLLINS
UNITED STATES DISTRICT JUDGE

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 5 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

STEPHEN OTTO REITZ,                    )    Case No. CV 07-1119-ABC (JTL)
                                       )
                Petitioner,            )    FINAL REPORT AND
                                       )    RECOMMENDATION OF UNITED
        v.                             )    STATES MAGISTRATE JUDGE
                                       )
CHARLES HARRISON, Warden,              )
                                       )
                Respondent.            )
_____)

    The Court submits this Final Report and Recommendation to the Honorable Audrey B. Collins, United States District Judge, pursuant to 28 U.S.C. Section 636 and General Order 05-07 of the United States District Court for the Central District of California.

## PROCEEDINGS

    On February 20, 2007, Stephen Otto Reitz ("Petitioner") filed a Petition for Writ of Habeas Corpus ("Petition") in the United States District Court for the Central District of California. On June 15, 2007, Charles Harrison ("Respondent") filed an Answer to the Petition ("Answer"). Petitioner did not file a Traverse.

    This matter is now ready for decision.

///

///

# BACKGROUND

On June 24, 2004, a jury convicted Petitioner of first degree murder (Cal. Penal Code §§ 187(a)(1), 189) and found that in the commission of the offense, Petitioner personally used two deadly weapons (Cal. Penal Code § 12022(b)(1)).  On August 19, 2004, the trial court sentenced Petitioner to state prison for a term of 26 years to life. (Clerk's Transcript ["CT"] at 227, 229).

Petitioner appealed his conviction to the California Court of Appeal. (See Respondent's Lodgment Nos. 1, 2, 3).  On August 12, 2005, the court of appeal affirmed Petitioner's conviction and sentence in full in an unpublished opinion. (Answer, Exh. A, Court of Appeal Opinion at 47).  Petitioner then filed a petition for review to the California Supreme Court. (Answer, Exh. B).  The California Supreme Court denied the petition for review on November 16, 2005. (Answer, Exh. C).

Petitioner filed the instant Petition on February 20, 2007.  On April 25, 2008, the Court issued a Report and Recommendation, recommending that the district court dismiss the Petition with prejudice. Petitioner did not file an Objection to the Report and Recommendation.

# SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Petitioner does not contest the sufficiency of the evidence to support his conviction. The Court, therefore, takes the following factual summary from the California Court of Appeal Opinion:

## A. [Petitioner]'s Relationship with the Victim

*[Petitioner] and the victim, Eva Weinfurtner, had been involved in a romantic relationship since January 2001.  Eva was married at the time, but had at some point separated from her husband. [Petitioner] met Eva through her son, whom defendant had known for some time. During the course of her relationship with defendant, Eva's friends and relatives noticed bruises on Eva's arms, legs, neck, and forehead that she did not have before she met [Petitioner]. Eva sometimes explained that the bruises were caused by her own clumsiness or accidents.  At*

other times, she said that [Petitioner] had been too rough while having "fun" with her or while having sex.

Eva told her niece, Lannelle Piro, and her friend, Alana Bast, that one bruise on Eva's thigh was caused by [Petitioner] biting her.  Eva also told Piro that on one occasion, while watching television, [Petitioner] had grabbed Eva by the throat and said, "Stop fucking looking at me like that."  Eva told another niece, Annette Mason, that she once woke up in the middle of the night to find [Petitioner] on top of her, strangling her.  Eva got [Petitioner] to stop, and [Petitioner] told her that he did it because he thought there was an intruder in the house.  Eva told Mason that she was afraid of [Petitioner] because of that incident.  Eva told Piro, Bast, and her son, Levi Loy, that she was afraid of [Petitioner].  Eva told Bast that she knew if she stayed with [Petitioner], he would kill her; however, she explained to Piro and Bast that she could not leave [Petitioner] because he was like a drug for her.

On April 18, 2001, Eva called her estranged husband, Karl.  She sounded frantic, and told him that [Petitioner] had broken through a plate glass window in her apartment, that she had run outside and called the police, and that the police were still looking for [Petitioner].  Eva told responding police officer Frank Hernandez that [Petitioner] had been in her apartment, that he was upset, and that she had asked him to leave.  Eva and [Petitioner] exchanged words as [Petitioner] left.  Some time later, Eva saw [Petitioner] on the balcony.  [Petitioner] broke the window and entered Eva's apartment, wielding a knife.  [Petitioner] told Eva that he would kill someone by gutting the person like a fish and then name that person after her.  Eva fled from the apartment and told a security guard to call the police.  She told Officer Hernandez that she was in a relationship with [Petitioner], that they had been involved in two prior domestic incidents, and that she was afraid of him.

**B. The Crime**

Sometime in 2001, Eva moved back in with her husband, Karl, and the couple attempted to repair their marriage.  Shortly before October 1, 2001, however, Eva lied to Karl by telling him that she was going to Catalina Island with her friend, Alana Bast, when in fact, Eva went

with [Petitioner].  According to [Petitioner], going to Catalina was Eva's idea, and she had made the reservations and purchased the ferry tickets.

On October 1, 2001, at approximately 1:00 or 1:30 a.m., [Petitioner] called his parents and told them that he was on Catalina Island and that he may have killed Eva.  [Petitioner's] father notified the police.  Detectives Richard Tomlin and Ken Gallatin of the Los Angeles County Sheriff's Department arrived at the crime scene, a hotel on Catalina Island.  Potted plants were located outside the door to each hotel room; however, outside the room in which Eva's body was found, there was only a base for a potted plant, and the plant itself was missing.  The detectives found Eva's body lying on the floor of the hotel room, at the foot of the bed, her head facing a sliding glass door.  Eva's body was bruised, her right arm appeared to be dislocated, and there were three large, gaping stab wounds on the back of her neck.  A pocketknife lay about four feet from her head, and pieces of a plastic fork were on the floor.  Dirt and fragments from a broken flower pot were strewn on the floor near Eva's head, and shards of broken pottery were imbedded in her scalp.  Based on the physical evidence, it appeared to Detective Tomlin that the attack occurred entirely in the area of the hotel room at the foot of the bed, but not on the bed itself.

An autopsy showed that Eva had sustained numerous blunt force injuries, knife wounds, cutting wounds that appeared to be caused by the broken shards of a flower pot, and puncture wounds that appeared to be caused by a fork.  Her right forearm had been dislocated from the elbow joint, her wrist, ribs, jaw, facial bones, and skull were fractured, and there were multiple bruises of the brain.

In a tape recorded interview after [Petitioner] waived his Miranda[1] rights, [Petitioner] told the detectives that he had no memory of the events that caused Eva's death.  [Petitioner] later testified at trial, however, that he had "flashbacks" or "visions" concerning the event, and he remembered certain details of the attack, such as being in an "all out struggle" with a male intruder, throwing down a flower pot, and feeling threatened.  [Petitioner] said that when he

---

[1] Miranda v. Arizona (1969) 396 U.S. 868, 24 L. Ed. 2d 122.

1  *became aware of Eva's body, he noticed the knife wounds on the back of her neck, that the*

2  *wounds were similar in appearance to the way sharks are killed by commercial fisherman by*

3  *slicing their spinal cords. [Petitioner] had worked as a commercial fisherman and assumed he*

4  *had caused those wounds. [Petitioner] also told the detectives that he would sometimes*

5  *sleepwalk. He recounted an incident in which he walked through a plate glass window while*

6  *sleepwalking. [Petitioner] claimed to have had a loving relationship with Eva and denied having*

7  *had any prior physical altercation with her.* (Answer, Exh. A, Court of Appeal Opinion at 48-50).

8

9  **PETITIONER'S CLAIMS**

10  1.     The trial court violated Petitioner's Fourteenth Amendment due process rights by

11  limiting testimony by Petitioner's expert witness regarding a person's ability to commit an act

12  of violence and murder while sleepwalking.

13  2.     The trial court violated Petitioner's rights under the Confrontation Clause when

14  it improperly admitted numerous hearsay statements made by Eva, the decedent.

15

16  **STANDARD OF REVIEW**

17  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the

18  Court's consideration of Petitioner's cognizable federal claims. 28 U.S.C. Section 2254(d), as

19  amended by the Act, states:

20  An application for a writ of habeas corpus on behalf of a

21  person in custody pursuant to the judgment of a State court

22  shall not be granted with respect to any claim that was

23  adjudicated on the merits in State court proceedings unless the

24  adjudication of the claim – (1) resulted in a decision that was

25  contrary to, or involved an unreasonable application of, clearly

26  established Federal law, as determined by the Supreme Court

27  of the United States; or (2) resulted in a decision that was

28

1       based on an unreasonable determination of the facts in light of

2       the evidence presented in the State court proceeding.

3       In Williams v. Taylor, 529 U.S. 362, 405-06 (2000), the United States Supreme Court

4   held that a state court's decision can be contrary to federal law if it either 1) fails to apply the

5   correct controlling authority, or 2) applies the controlling authority to a case involving facts

6   materially indistinguishable from those in a controlling case, but nonetheless reaches a

7   different result. A state court's decision can involve an unreasonable application of federal law

8   if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a

9   way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal

10  principle to a new context in a way that is objectively unreasonable. Id. at 407-08. The

11  Supreme Court has admonished courts against equating the term "unreasonable application"

12  with "clear error": "These two standards . . . are not the same. The gloss of clear error fails to

13  give proper deference to state courts by conflating error (even clear error) with

14  unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). Instead, in this context,

15  habeas relief may issue only if the state court unreasonably applied firmly established federal

16  law. Id.

17      Here, Petitioner raised both his claims on direct appeal to the California Court of Appeal.

18  (See Respondent's Lodgment 1, 2, 3). The court of appeal rejected Petitioner's claims in a

19  reasoned decision. (See Answer, Exh. A, Court of Appeal Opinion). The California Supreme

20  Court summarily denied Petitioner's petition for review. (Answer, Exh. C).

21      The United States Supreme Court has held that "[w]here there has been one reasoned

22  state judgment rejecting a federal claim, later unexplained orders upholding the judgment or

23  rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803

24  (1991). This Court therefore "looks through" the California Supreme Court's "silent denial" of

25  Petitioner's claim to the court of appeal's reasoned decision, and reviews that decision under

26  the AEDPA standards. See id.; see also Gill v. Ayers, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

27  (the court "'look[s] through' the unexplained California Supreme Court decisions to the last

28  reasoned decision, the state appellate court's decision, as the basis for the state court's

1 | judgment"); <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (same); <u>see</u> <u>also</u>

2 | <u>Ylst</u>, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing . . . a

3 | presumption which gives them <u>no</u> effect–which simply 'looks through' them to the last reasoned

4 | decision–most nearly reflects the role they are ordinarily intended to play.") (emphasis in

5 | original); <u>Pham v. Terhune</u>, 400 F.3d 740, 742 (9th Cir. 2005). Where a state court has issued

6 | a reasoned decision explaining why it denied a petitioner's claims for relief, the reviewing court

7 | must accord substantial deference to that decision and decide only whether it was contrary to,

8 | or resulted in an unreasonable application of, firmly established law. <u>Andrade</u>, 538 U.S. at 75.

9 |

10 | **DISCUSSION**

11 | **I.  PETITIONER'S CLAIM THAT THE TRIAL COURT VIOLATED HIS DUE PROCESS**

12 | **RIGHTS BY LIMITING THE EXPERT TESTIMONY OF TWO OF HIS EXPERT**

13 | **WITNESSES DOES NOT WARRANT FEDERAL HABEAS RELIEF**

14 | In Claim One, Petitioner contends that the trial court violated Petitioner's due process

15 | rights under the Fourteenth Amendment by limiting the testimony of two of his expert

16 | witnesses, Clete Kushida, Ph.D. and Samuel George Benson, Jr., M.D. Specifically, Petitioner

17 | argues that (1) the trial court abused its discretion by precluding his experts from testifying

18 | about whether it is possible for a person to commit violence upon a person or kill while

19 | sleepwalking and (2) the trial court improperly sustained an objection to a hypothetical question

20 | posed to Dr. Benson. Petitioner also argues that the resulting error was not harmless because

21 | it prevented him from properly establishing a defense. (<u>See</u> Petition, Attachment).  As

22 | discussed below, Claim One lacks merit.[2]

23 | ///

24 | ///

25 |

26 | [2] Respondent contends that Claim One is barred by the doctrine of procedural default.  (Answer at 25-26).  Federal courts may address allegedly defaulted habeas claims on the merits if the lack of

27 | merit is clear but the procedural default issues are not. <u>Lambrix v. Singletary</u>, 520 U.S. 518, 523-25 (1997); <u>Franklin v. Johnson</u>, 290 F.3d 1223, 1232 (9th Cir. 2002).  In the interests of judicial

28 | economy, the Court has proceeded to the merits of the claim.

### 1. **Dr. Kushida**

The trial court precluded Petitioner's expert, Dr. Kushida, a neurologist specializing in sleep disorders and the director of the Stanford University Center for Human Sleep Research, from opining that a person is capable of killing or murdering another person while sleepwalking. The trial court determined that Dr. Kushida's opinion was not based on reliable or trustworthy information, and was not generally accepted in the scientific community, as required by People v. Kelly, 17 Cal.3d 24, 30 (1976), due to the lack of reliable or trustworthy support for such an opinion. (See Reporter's Transcript ["RT"] at 647). In a hearing outside the presence of the jury, Dr. Kushida testified that he had personally observed two incidents in which a person committed acts of violence while asleep. In one incident, the person threw objects at Dr. Kushida, and in another, the person made "threatening gestures." (RT at 631, 651). Dr. Kushida further testified that experts in the field of sleep disorders had concluded, based on studies, that sleepwalkers are capable of committing violence while unconscious. (RT at 641, 647-48). These studies were based, in part, on personal observations by researchers and, in part, on statements relayed by others who described sleepwalking incidents. No follow-up investigation was conducted to verify the truth or accuracy of the third-party accounts of sleepwalking. (RT at 634). When asked how he could be sure that the reported incidents of violence while sleepwalking occurred while the perpetrator was asleep, Dr. Kushida responded that there were seven criteria for evaluating sleepwalking claims.[3] (RT at 636-38). Dr. Kushida also opined that it was "generally accepted in the scientific community" that a person could commit murder while sleepwalking. (RT at 640). He explained, however, that this opinion was

---

[3] Dr. Kushida explained that there are seven criteria for determining whether a person who committed a harmful act on another was sleepwalking at the time: (1) whether there was a reason to suspect sleepwalking based on the perpetrator's history or based on a sleep study; (2) whether the duration was compatible with the presumed diagnosis, i.e., whether the perpetrator had a sleepwalking problem at the time of the act; (3) whether the conduct was seemingly senseless and without motivation; (4) whether, immediately afterward, the perpetrator was perplexed and horrified and made no attempt to conceal the act; (5) whether there was amnesia for most of the events; (6) whether the act occurred during the first third of sleep, when most stage three or stage four sleep occurs; and (7) whether there was prior sleep deprivation, which can trigger a sleepwalking episode. (RT at 633-38).

1  based entirely on case studies of criminal cases in which criminal defendants had asserted a

2  sleepwalking defense, the defendant had a history of violence while sleepwalking, and they

3  showed evidence of sleepwalking. (RT at 640-42, 648). But Dr. Kushida also testified that

4  "you really can't say 100 percent that that's what happened . . . because we don't have the

5  electrodes hooked up to the person while they are committing the act." (RT at 642).

6      The trial court noted the absence of any "empirical scientific data" to support Dr.

7  Kushida's opinion and expressed doubt as to whether that opinion was generally accepted in

8  the scientific community. (RT at 646-48). Accordingly, the trial court ruled that Dr. Kushida

9  could not testify that sleepwalkers were capable of killing another person while unconscious,

10  but Dr. Kushida could testify that sleepwalkers were capable of certain specified acts of

11  violence. (RT at 648, 650, 659-62). When the prosecutor objected to the use of the words

12  "violence" or "violent" on the ground that those words could be understood to include murder,

13  the trial court sustained the prosecution's objection and precluded Dr. Kushida from using the

14  word "violent." (RT at 659-62). The court stated that, otherwise, Petitioner's counsel had broad

15  latitude to question Dr. Kushida. (RT at 662). For example, Dr. Kushida could testify that a

16  sleepwalker had the ability to commit particular acts, including stabbing someone with a knife,

17  stabbing someone with a fork, or hitting someone over the head with a flower pot. (RT at 660-

18  61).

19      Petitioner now contends that the trial court erred by limiting Dr. Kushida's testimony.

20  Petitioner previously raised this claim on direct appeal to the California Court of Appeal.[4] (See

21  Answer, Exh. A; Respondent's Lodgement Nos. 1, 2, 3). In rejecting the claim, the court of

22

23  [4] The court of appeal declined to address whether the trial court erred by applying the Kelly-Frye

24  standard. (See Answer, Exh. A, Court of Appeal Opinion at 57). People v. Kelly, 17 Cal.3d 24, 30 (1976), and Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), stand for the proposition that

25  the admissibility of evidence produced by a new scientific technique requires a preliminary showing that: (1) the technique is generally accepted in the relevant scientific community; (2) the witness

26  testifying on the technique is properly qualified as an expert; and (3) correct scientific procedures were followed in the particular case. Although the definition of a new scientific technique is unclear,

27  courts will make the determination by reference to its narrow common sense purpose, i.e., to protect the jury from techniques which, though new, novel or experimental, convey a misleading aura of

28  certainty. People v. Stoll, 49 Cal.3d 1136, 1155-56 (1989).

1    appeal found that the trial court did not abuse its discretion in concluding that anecdotal

2    accounts of sleepwalking relayed to Dr. Kushida by others and information gleaned from Dr.

3    Kushida's review of criminal cases in which defendants raised a sleepwalking defense were

4    not sufficiently reliable bases for Dr. Kushida's opinion that sleepwalkers are capable of

5    murder. (Answer, Exh. A, Court of Appeal Opinion at 58).

6    The court of appeal held that the trial court correctly applied the state evidentiary rules

7    to preclude an expert opinion due to the lack of reliable or trustworthy support for such an

8    opinion. Under California Evidence Code Section 801, subdivision (b), if a witness is testifying

9    as an expert, his testimony in the form of an opinion is limited to such an opinion as is based

10   on matter "that is of a type that reasonably may be relied upon by an expert in forming an

11   opinion upon the subject to which his testimony relates, unless an expert is precluded by law

12   from using such matter as a basis for his opinion." In this case, Dr. Kushida's opinion was

13   based upon unverifiable information. The anecdotal accounts of sleepwalking incidents relayed

14   to Dr. Kushida by others, and the information gleaned from Dr. Kushida's case study of criminal

15   cases were not sufficiently reliable bases upon which to base an expert opinion that

16   sleepwalkers are capable of committing murder. (Answer, Exh. A, Court of Appeal Opinion at

17   58). Dr. Kushida testified that the only way to be certain that a person was sleepwalking while

18   committing an act was if there were "electrodes hooked up to the person while they are

19   committing the act." (RT at 642). There is no indication that the statements relayed by others

20   occurred when the observed subjects were monitored by electrodes and there were no follow-

21   up investigations. Similarly, there is no indication that the criminal defendants who asserted

22   sleepwalking defenses in the cases that Dr. Kushida reviewed were, in fact, monitored.

23   Because Dr. Kushida was not certain that the acts that formed the basis of his opinion occurred

24   while the subjects were sleepwalking, the court of appeal held that the trial court did not abuse

25   its discretion by limiting Dr. Kushida's testimony regarding acts that someone can commit while

26   sleepwalking to those acts that Dr. Kushida had personally observed. (See Answer, Exh. A,

27   Court of Appeal Opinion at 58).

28   ///

1    The court of appeal also noted that Petitioner was permitted to present extensive expert

2    testimony by five different doctors concerning his mental health problems and sleep disorders,

3    including sleepwalking and sleep terrors, as well as testimony from family and friends

4    concerning his behavior:

> Dr. Daniel Amen, a psychiatrist specializing in brain imaging,
> testified that [Petitioner] had significant brain trauma affecting
> the left temporal lobe that prevented him from leading a normal
> life and that impaired his judgment, impulse control, planning
> and forethought.  Dr. William Pierce, a psychologist, opined
> that [Petitioner] suffered from sleep walking and sleep terrors
> caused by nocturnal seizures.  Dr. Pierce further testified that
> his diagnosis was consistent with Dr. Amen's findings of
> temporal lobe damage, and that during a temporal lobe
> seizure, a person could be unconscious yet still perform what
> appear to be conscious tasks.  According to Dr. Pierce, an
> unconscious person cannot plan, reason, or use judgment.  Dr.
> Kushida testified that there are seven criteria for evaluation
> [sic] sleepwalking claims, and that defendant satisfied all
> seven criteria.  Dr. Kushida further testified that, based on his
> personal observations and other reported cases, a person who
> sleepwalks is capable of stabbing, beating, breaking
> someone's bones, and hurting someone else.  Dr. Benson
> testified that a person with a seizure-related sleepwalking
> disorder is capable of committing "very dangerous" acts to
> himself or to others while unconscious.

26   (Answer, Exh. A, Court of Appeal Opinion at 61-62).  The court of appeal concluded that the

27   "few limitations imposed by the trial court on the expert testimony did not impair defendant's

28   due process right to present a sleepwalking defense or his Sixth Amendment right to present

witnesses." (Answer, Exh. A, Court of Appeal Opinion at 62). As discussed below, the trial court's decision was neither contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d).

The Constitution guarantees a criminal defendant a meaningful opportunity to introduce relevant evidence on his behalf. Crane v. Kentucky, 476 U.S. 683, 690 (1986). This right, however, is subject to reasonable restrictions "to accommodate other legitimate interests in the criminal trial process." United States v. Scheffer, 523 U.S. 303, 308 (1998) (internal citations omitted). Accordingly, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. Menendez v. Terhune, 422 F.3d 1012, 1033 (9th Cir. 2005); see, e.g., Mitchell v. United Nat'l Ins., 127 Cal App. 4th 457, 478 (2005) (trial court may properly exclude expert opinion which is found to be unreliable or based on unreliable matter); People v. Carpenter, 21 Cal. 4th 1016, 1061 (1999) (trial court may properly exclude unreliable hearsay underlying an expert's testimony). The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate. Scheffer, 523 U.S. at 308.

In order to obtain habeas relief on his claim, Petitioner must demonstrate that the trial court's incorrect application of state evidentiary rules rose to the level of a constitutional violation. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). As a general proposition, federal habeas courts do not review questions of state evidentiary law. See Jammal v. Van De Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("We are not a state supreme court of errors; we do not review questions of state evidence law."); see also Estelle, 502 U.S. at 67 ("Such an inquiry, however, is no part of a federal court's habeas review of a state conviction. We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (citations omitted). Thus, to the extent Claim One is merely a state law claim, this Court lacks authority to grant habeas relief. See Estelle, 502 U.S. at 67-68; see also O'Bremski v. Maass, 915 F.2d 418, 423 (9th Cir. 1990) ("A writ of habeas corpus is available for a state prisoner 'only on the ground that he is in custody in violation of the Constitution, laws or treaties of the United States.'") (citations omitted). In order for a state rule of evidence to violate due process, it must

1   offend "some principle of justice so rooted in the traditions and conscience of our people as to
2   be ranked as fundamental." Patterson v. New York, 432 U.S. 197, 201-02 (1977).

3         Petitioner argues that Dr. Kushida's opinion that a sleepwalker could commit an act of
4   violence provided the very basis for his defense. (Petition, Attachment at 26). Thus, the trial
5   court's restrictions on Dr. Kushida's testimony precluded Petitioner from establishing a defense.
6   As discussed below, Petitioner fails to demonstrate that the trial court's evidentiary rulings
7   amounted to a due process violation.

8         Petitioner "does not have an unfettered right to offer testimony that is incompetent,
9   privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484
10  U.S. 400, 410 (1988); see also Scheffer, 523 U.S. at 308.  The trial court acted within its
11  discretion in finding that Dr. Kushida was not allowed to testify to an opinion that lacked reliable
12  or trustworthy support and could be misleading to the jury. See Menendez, 422 F.3d at 1033
13  ("[A] trial judge may exclude or limit evidence to prevent . . . confusion of the issues, or
14  misleading the jury.  The trial judge enjoys broad latitude in this regard, so long as the rulings
15  are not arbitrary or disproportionate.") (internal citations omitted).  The trial court's decision to
16  preclude Dr. Kushida from testifying that a person could commit an act of violence or murder
17  while sleepwalking was neither arbitrary nor disproportionate, given the unreliable bases of Dr.
18  Kushida's opinion and the potential for misleading the jury.  Thus, the trial court's limitation on
19  Dr. Kushida's testimony did not amount to a due process violation. See Scheffer, 523 U.S. at
20  308.

21         Moreover, even assuming the limitation on Dr. Kushida's testimony did amount to a due
22  process violation, Petitioner cannot show he was prejudiced as a result.  See Brecht v.
23  Abrahamson, 507 U.S. 619, 637-38 (1993) (A trial error is not grounds for granting a habeas
24  petition unless it had a "substantial and injurious effect or influence in determining the jury's
25  verdict.").  Petitioner argues that the limitations on Dr. Kushida's testimony left him with "little
26  defense at all" and the court of appeal's finding "that the few limitations imposed by the trial
27  court on the expert testimony did not impair defendant's due process right to present a
28  sleepwalking defense or his Sixth Amendment right to present witnesses" was unreasonable

in light of the Supreme Court's decisions in <u>Washington v. Texas</u>, 388 U.S. 14 (1967) and <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986). (Petition, Attachment at 25). Petitioner, however fails to show that the decision of the trial court was either contrary to or an unreasonable application of <u>Washington</u>, <u>Crane</u>, or other clearly established law as determined by the Supreme Court.

In <u>Washington v. Texas</u>, the Supreme Court held that the denial of an accused's Sixth Amendment right to have compulsory process for obtaining witnesses in his favor was so fundamental that it was incorporated into the due process clause of the Fourteenth Amendment. 388 U.S. at 19. In <u>Washington</u>, the Supreme Court found that the trial court arbitrarily prohibited a defense witness, who was the only eyewitness, from testifying at the trial under a Texas statute prohibiting any co-participant in a crime from testifying on behalf of his fellow participant. <u>Id.</u> at 23. While the defense witness's testimony lacked special assurances of reliability, the Supreme Court found that its exclusion violated the defendant's rights because the state interest, to set apart a group of persons who are likely to commit perjury, was weak. <u>Id.</u> at 22-23.

While the right to present a defense is fundamental, <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973); <u>United States v. Ballesteros-Acuna</u>, 527 F.2d 928, 930 (9th Cir. 1975), a defendant's right to present evidence is not absolute. <u>See Perry v. Rushen</u>, 713 F.2d 1447, (9th Cir. 1983). "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." <u>Chambers</u>, 410 U.S. at 302; <u>see also</u> <u>Washington</u>, 388 U.S. at 23 n. 21.

Here, Petitioner had the opportunity to present evidence in support of his sleepwalking defense. Dr. Kushida was one of five defense experts that testified at the trial and Petitioner called nine additional witnesses to testify in his defense. Although Dr. Kushida was precluded from testifying that a person could commit an act of violence or murder while sleepwalking, he did testify about the sleep study in which he had Petitioner participate. Dr. Kushida testified that during the sleep study, Petitioner sat up, screamed, and jumped out of bed. The electrodes monitoring Petitioner's brain waves at the time showed that he was in sleep stages

three and four, the deepest stages of sleep, when these acts occurred. (RT at 620-22). The incident was also recorded on videotape. The sleep study showed that Petitioner suffered from various sleep disorders, all consistent with sleepwalking. (RT at 622-23). Dr. Kushida opined during trial that Petitioner suffered from three sleep disorders, including sleep terrors, and was capable of harming others while sleepwalking. (See RT at 680-83). Dr. Kushida discussed the seven criteria he used to determine whether a person who committed a harmful act on another was sleepwalking at the time and testified that in his opinion, Petitioner's case met all seven criteria.[5]  (RT at 666-73).

Dr. Kushida also testified about the acts in which a person is capable of engaging while sleepwalking. Dr. Kushida testified that a person can perform complex acts while sleepwalking. He testified that during one sleep study, he had witnessed a patient remove objects from a drawer and throw them at Dr. Kushida even though the electrode monitors indicated the patient was asleep. (RT at 668-69).  He cited other incidents of sleepwalkers doing complex tasks involving tools and other objects such as using a key to start the engine of a car and backing it out of the driveway, and using a real hammer and nails to hang imaginary pictures on a wall. (RT at 668-69).  Dr. Kushida testified that it is possible for a person to stab or beat another person, or to break another person's bones while sleepwalking. (RT at 667-68).  In light of the need to assure both fairness and reliability in the determination of Petitioner's guilt or innocence and the trial court's interest in avoiding juror confusion, the trial court's decision, which complied with established rules of procedure and evidence, did not violate Petitioner's right to present a defense. See Chambers, 410 U.S. at 302.

Petitioner also argues that the decision of the trial court was unreasonable in light of the Supreme Court's holding in Crane v. Kentucky, 476 U.S. 683 (1986). In Crane, the Supreme Court held that criminal defendants are guaranteed "a meaningful opportunity to present a complete defense." 476 U.S. at 690. In Crane, the Supreme Court held that, where the credibility of a defendant's confession was at issue, the exclusion of evidence concerning the

---

[5]  See footnote 3, supra.

1  circumstances in which the defendant's confession was given violated the defendant's
2  constitutional right to present evidence to prove that his confession was false under the
3  Fourteenth and Sixth Amendments.

4        Crane, however, has nothing to do with limitations on unreliable testimony impairing an
5  accused's due process right to present a defense or the Sixth Amendment right to present
6  witnesses.   Moreover, this case differs from Crane in that Petitioner here was afforded a
7  meaningful opportunity to present a complete defense.  Five defense experts testified about
8  Petitioner's mental health problems and sleep disorders. In addition, Dr. Benson, a psychiatrist
9  and pharmacologist, testified that a person with a seizure-related sleepwalking disorder was
10 capable of committing "very dangerous" acts to himself or to others while unconscious and Dr.
11 Kushida testified that it was possible for a person, while sleepwalking, to stab or beat another
12 person, or to break another person's bones.  The trial court precluded only testimony that was
13 based on unverified hearsay and data gleaned from a case study of criminal cases that was
14 not corroborated by any independent evidence.  Even if the court's decision was in error, given
15 the extensive testimony provided by defense witnesses regarding Petitioner's mental health
16 problems, his propensity for sleepwalking, and the acts in which an individual generally is
17 capable of engaging while sleepwalking, the error was harmless. Brecht, 507 U.S. at 622-623,
18 638.

19       In light of the foregoing, the California Court of Appeal's denial of Petitioner's claim was
20 neither contrary to, nor an unreasonable application of, clearly established federal law as
21 determined by the United States Supreme Court.[6]

22

23 ─────────────────

   [6] Petitioner also argues that the decision of the trial court is unreasonable under Davis v. Alaska,
24 415 U.S. 308 (1974) (failure to allow a criminal defendant the opportunity to impeach the credibility
   of a prosecution witness by cross examination directed at possible bias deriving from the witness's
25 probationary status as a juvenile delinquent violated the defendant's right to confrontation under the
   Sixth Amendment).  Petitioner argues that he was denied his right to demonstrate the accuracy and
26 truthfulness of his defense under Davis.  The Court finds Petitioner's reliance on Davis is misplaced
   given that Petitioner is challenging the trial court's decision to preclude Petitioner's own witness from
27 testifying whether it was possible for a person to commit violence upon a person or murder while
   sleepwalking.  Nonetheless, for the reasons discussed above, the Court finds that the trial court's
28 limitations on Dr. Kushida's testimony did not violate Petitioner's right to present his theory of
   defense.

### 2. **Dr. Benson**

The trial court also sustained an objection to a proposed hypothetical that Petitioner's counsel gave to Dr. Benson, who examined Petitioner and reviewed his history and the results of his various medical and psychological tests. (RT at 790-92). The prosecutor argued that Petitioner's counsel's proposed hypothetical, which would have focused on whether a person could have committed certain acts while sleepwalking, improperly sought a conclusion on an ultimate issue in the case, or elicited testimony that the trial court had already prohibited, – whether it was possible for a sleepwalker to kill. The trial court sustained the prosecution's objection on both grounds. (RT at 790-92).

Petitioner previously raised this claim on direct appeal to the California Court of Appeal. (See Answer, Exh. A; Respondent's Lodgement Nos. 1, 2, 3). In rejecting the claim, the court of appeal found that the trial court erred, but that the error was harmless. (Answer, Exh. A, Court of Appeal Opinion at 59-63). The court of appeal noted that the similarity of the proposed hypothetical to the facts of the instant case and the fact that the proposed hypothetical sought to elicit testimony on an ultimate issue in the case were not legitimate grounds for exclusion. (Answer, Exh. A, Court of Appeal Opinion at 59-61). Nonetheless, the court of appeal found that the resulting error was harmless under the standard of review for evidentiary error set forth in People v. Watson, 46 Cal. 2d 818 (1956) and Chapman v. California, 386 U.S. 18 (1967). See Watson, 46 Cal. 2d at 836 (defendant must show a reasonable probability of a more favorable verdict but for the error); Chapman, 386 U.S. at 24 (reversal is required unless the error was harmless beyond a reasonable doubt).

In finding that the resulting error was harmless, the court of appeal noted:

> [Petitioner] suffered no prejudice as a result of the evidentiary rulings. The physical evidence concerning the circumstances of the crime and the nature and extent of Eva's injuries weighed against [Petitioner]'s claim that he was sleepwalking during the attack. The evidence suggested that Eva was attacked with a flowerpot while she was awake and standing

1  in the room and that a knife was used to cut the back of her
2  neck while she lay on the floor.   There was no physical
3  evidence that any part of the attack occurred in the bed. There
4  were no weapons or blood on the bed. The circumstances of
5  the attack were far more complex than anything [Petitioner]
6  had previously done while sleepwalking, such as sitting up in
7  bed, punching a hole through a wall, or walking out a window.
8  Multiple weapons were used, including a knife, fork, and a
9  flower pot taken from outside the room, brought inside, and
10  used to strike Eva repeatedly on the head.    Although
11  [Petitioner] had no recollection at all concerning previous
12  sleepwalking incidents, he testified at trial that he recalled
13  certain details of the attack on Eva, including being in an "all
14  out struggle" with a male intruder, throwing a flowerpot, and
15  feeling threatened.  There was overwhelming evidence that
16  [Petitioner] had engaged in violent or aggressive behavior
17  toward others while he was conscious and not sleepwalking.
18  In light of the evidence, it is unlikely that the jury would have
19  found [Petitioner]'s sleepwalking defense to be credible, even
20  absent the few limitations on the expert testimony imposed by
21  the trial court.  Any error was harmless beyond a reasonable
22  doubt.

23  (Answer, Exh. A, Court of Appeal Opinion at 62).

24      A federal habeas petition will not be granted "if the state court simply erred in concluding

25  the state's errors were harmless; rather, habeas relief is appropriate only if the [state court]

26  applied harmless-error review in an 'objectively unreasonable' manner." Mitchell v. Esparza,

27  540 U.S. 12, 17-18 (2003).  While California state courts utilize the Chapman standard of

28  harmlessness for constitutional error, federal habeas courts utilize the standard set forth in

1  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which requires an analysis of whether the
2  constitutional error had a "substantial and injurious effect or influence in determining the jury's
3  verdict." When a state court finds a constitutional error harmless under the Chapman standard,
4  a federal court may not grant habeas relief unless it determines both that the state court's
5  decision was contrary to or an unreasonable application of Chapman, and that the petitioner
6  suffered prejudice under Brecht. Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir. 2005).
7  The reviewing court may address the two tests in any order. Id.

8          Here, the resulting error did not have a substantial and injurious effect or influence on
9  the jury's verdict. As discussed above, Petitioner was able to present expert testimony in
10  support of his sleepwalking defense. Five defense experts testified regarding Petitioner's
11  mental health problems, sleep disorders and the acts an individual is capable of while
12  sleepwalking. Numerous other defense witnesses, including Petitioner's parents, testified
13  regarding Petitioner's history of sleepwalking. While Dr. Benson was precluded from answering
14  one hypothetical question, he did testify extensively about the nature of sleepwalking. (RT at
15  750-807). Dr. Benson opined that Petitioner suffered from bipolar disorder and a sleepwalking
16  disorder with seizures caused by organic brain damage. (RT at 754-59, 777, 781, 792-93).
17  Dr. Benson stated that during a seizure, a patient is unconscious but is capable of moving and
18  doing unpredictable things. Dr. Benson further opined that people who suffer from partial
19  complex seizures tend to be more violent than other people, and a person who sleepwalks in
20  connection with seizures can be dangerous to himself and to others. (RT at 763, 771, 787-88,
21  801-02). Petitioner presented ample evidence regarding the conditions of sleepwalking as it
22  related to his theory of defense. In light of the testimony provided by Dr. Benson and the other
23  defense witnesses, the error that resulted from barring the hypothetical did not have a
24  substantial and injurious effect on the verdict. See Brecht, 507 U.S. at 637.

25          In light of the foregoing, the California Court of Appeal's denial of Petitioner's claim was
26  not contrary to, nor an unreasonable application of, clearly established federal law, as
27  determined by the United States Supreme Court. See 28 U.S.C. § 2254(d).

28          Accordingly, the Court rejects Petitioner's first claim.

**II.   PETITIONER'S CONFRONTATION CLAUSE CLAIMS UNDER _CRAWFORD_ DO NOT WARRANT FEDERAL HABEAS RELIEF**

In Ground Two, Petitioner contends that the trial court violated his Sixth Amendment right to confront a witness. Petitioner argues that the court of appeal unreasonably determined that the trial court's admission of various hearsay statements made by Eva, the decedent, was harmless. Petitioner challenged six statements in the court of appeals: (1) Eva's statement to her son Levi Loy that she was afraid of Petitioner (RT at 166); (2) Eva's statement to her niece Lanelle Piro that she was terrified of Petitioner but that he was like a drug for her and she could not get away from him (RT at 221); (3) Eva's statement to Piro that she was anemic and bruised easily and that one bruise on her thigh was caused by Petitioner biting her (RT at 219-21); (4) Eva's statement to her niece Annette Mason that her bruises were caused by "rough sex" (RT at 244); (5) Eva's statement to her friend, Alana Bast, that defendant had gone through a plate glass window in her apartment and that Eva left the apartment because she was afraid (RT at 233-34); and (6) Eva's statement to Piro that once, while she and Petitioner were watching television, Petitioner grabbed her by the throat and said, "Stop fucking looking at me like that." (RT at 220-21).

Petitioner previously raised this claim on direct appeal to the California Court of Appeal. (See Answer, Exh. A; Respondent's Lodgement Nos. 1, 2, 3). In rejecting the claim, the court of appeal held that the trial court erred in admitting the hearsay statements, but that the resulting error was harmless under state law. (Answer, Exh. A, Court of Appeal Opinion at 63-65). The court of appeal also held that the statements did not violate Petitioner's right to confrontation under the Sixth Amendment because the statements were not "testimonial" within the meaning of Crawford v. Washington, 541 U.S. 36, 59 (2004). (Answer, Exh. A, Court of Appeal Opinion at 66-67). Because a state court has issued a reasoned decision explaining why it denied Petitioner's claims for relief, on review, the Court must accord substantial deference to that decision and decide only whether the decision was contrary to, or resulted in an unreasonable application of, firmly established law. See Andrade, 538 U.S. at 75.

///

1    Under Crawford, the government may not introduce testimonial out-of-court statements

2    of a witness unless the witness is unavailable and the defendant has had a prior opportunity

3    for cross-examination.  541 U.S. at 59.  There is no indication that the statements Eva made

4    to her son, nieces and friend were made with any anticipation of being used in court, nor is

5    there any indication that it was foreseeable to Eva that the statements would be offered at trial.

6    The statements at issue were clearly not "the functional equivalent" of in-court testimony,

7    "formalized testimonial materials," or intended "for use at a later trial," and are, therefore, not

8    testimonial.  See id. at 52.  Thus, the court of appeal's decision that the admitted statements

9    did not violate Petitioner's right to confrontation under the Sixth Amendment was not contrary

10   to, or an unreasonable application of, clearly established federal law, as determined by the

11   United States Supreme Court.  See 28 U.S.C. § 2254(d).

12       Even if the admitted statements did violate Petitioner's right to confront a witness under

13   Crawford, in order to merit habeas relief, Petitioner would still have to show that the statements

14   were harmful - that in light of the record as a whole, the admission of the hearsay statements

15   had a substantial and injurious effect or influence on the verdict.  See Brecht, 507 U.S. at 638.

16       Petitioner argues that the statements were harmful because the statements (1) provided

17   a motive, in the form of evidence of Petitioner's violent nature, that undermined Petitioner's

18   sleepwalking defense; and (2) constituted improper character evidence. Petitioner argues that

19   these admissions of uncharged offenses so prejudiced the case to the point where they eroded

20   the standard of proof beyond a reasonable doubt.

21       The court of appeal did not find the statements prejudicial in light of the properly

22   admitted evidence and statements presented at the trial.  With regard to the challenged

23   statements concerning Eva's bruises, the court of appeal found them "cumulative of other

24   direct, admissible evidence concerning Eva's bruises and that those bruises were likely caused

25   by [Petitioner]" and cited to People v. Anderson, 43 Cal. 3d 1104, 1129 (1987) ("if the properly

26   admitted evidence is overwhelming and the incriminating extrajudicial statement is merely

27   cumulative of other direct evidence, the error will be deemed harmless").  (Answer, Exh. A,

28   Court of Appeal Opinion at 65).  The court of appeal went on to note that "Piro, Mason,

1  Shockley and Bast all testified that they personally observed Eva's bruises during her

2  relationship with [Petitioner], and that she had no similar bruises before the relationship."

3       With regard to the admission of Eva's statement to Bast about the incident in which

4  Petitioner broke through the plate glass window of Eva's apartment, the court of appeal found

5  it harmless "in light of the admissible statements concerning that incident that Eva made to her

6  estranged husband Karl, and to Officer Frank Hernandez." (Answer, Exh. A, Court of Appeal

7  Opinion at 65).

8       With regard to the remaining challenged hearsay statements made by Eva - that

9  Petitioner grabbed her by the throat  (RT at 220-21), that she was afraid of Petitioner (RT at

10  166), and terrified of him (RT at 221) - that Petitioner argues constituted improper evidence of

11  a violent nature, the court of appeal found that:

12          [Petitioner]'s argument that he was prejudiced by hearsay

13          statements that portrayed him as violent and abusive is

14          outweighed by other admissible evidence of his violent nature,

15          including an incident in which defendant used a club to smash

16          the hood of another car; his involvement in a physical fight

17          with strangers outside a liquor store on the night he broke into

18          Eva's apartment; his "bumping" a female police officer; and

19          his breaking through Eva's window, wielding a knife, and

20          threatening to gut someone like a fish and name that person

21          after Eva.  Admission of the challenged statements was

22          harmless beyond a reasonable doubt.

23  (Answer, Exh. A, Court of Appeal Opinion at 65).

24       A federal habeas petition will not be granted "if the state court simply erred in concluding

25  the state's errors were harmless; rather, habeas relief is appropriate only if the [state court]

26  applied harmless-error review in an 'objectively unreasonable' manner." Mitchell, 540 U.S. at

27  17-18. Under Brecht, 507 U.S. at 637, the constitutional error must have caused a petitioner

28  such prejudice as to amount to a "substantial and injurious effect or influence in determining

1   the jury's verdict." Here, the statements were not prejudicial in light of the properly admitted
2   evidence and statements presented at the trial.

3        At trial, Karl Weinfurtner, Eva's estranged husband, testified that Eva called him after
4   the incident and was frightened and frantic when he arrived at the apartment. (RT at 119-20).
5   He testified that he saw the broken glass and helped her pick it up. (RT at 120). Officer
6   Hernandez testified that he observed the broken glass, that Eva identified Petitioner as the
7   person involved, and that Eva was afraid of Petitioner because he said that he was going to
8   kill someone, specifically, that he was going to kill someone by "filleting someone with a knife
9   . . . gut him up like a fish and name the person after her." (RT at 271, 274-75). In addition,
10  Petitioner described the incident at trial. (RT at 293-300). He stated that he remembered
11  arguing with Eva from outside of the apartment and breaking the glass door after being unable
12  to get into the apartment through the door or window. (RT at 299-300).

13       Other witnesses testified about Petitioner's violent nature as well, including Madelyn
14  Reitz, Petitioner's mother (RT at 468-69), Daniel G. Munzo, Ph.D. (RT at 559, 560), Ashley
15  Newton, Petitioner's former girlfriend (RT at 494-47) and Petitioner himself, who testified to
16  getting into physical fights, deliberately shoving a female police officer, pushing his father, and
17  being emotionally abusive to his sister. (RT at 295-306, 356-59, 386-87). Numerous witnesses
18  testified that they personally observed Eva's bruises and that she had no similar bruises before
19  her relationship with Petitioner. (RT at 219, 177-78, 231-33).

20       In light of the properly admitted evidence at trial, the error resulting from the admission
21  of the challenged hearsay statements did not to amount to a "substantial and injurious effect
22  or influence in determining the jury's verdict." Thus, the California Court of Appeal's denial of
23  Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly
24  established federal law, as determined by the United States Supreme Court. See 28 U.S.C.
25  § 2254(d).

26       Accordingly, the Court rejects Petitioner's second claim.

27  ///

28  ///

23

## RECOMMENDATION

THE COURT, THEREFORE, RECOMMENDS that the District Court issue an Order: (1) approving and adopting this Final Report and Recommendation; and (2) directing that Judgment be entered denying the Petition for Writ of Habeas Corpus and dismissing this action with prejudice.

DATED: July 25, 2008

/s/
JENNIFER T. LUM
UNITED STATES MAGISTRATE JUDGE